JUAN ORONA ACEVEDO, peticionario, EX PARTE; CARMEN ACEVEDO, opositora y apelante.

*Número:* 12900  *Resuelto:* 25 de marzo de 1963

*José Alberty Orona,* abogado de la apelante; *José M. Cruz Vargas,* abogado del peticionario.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El 13 de abril de 1960 la Sala de Aguadilla del Tribunal Superior dictó Resolución declarando único y universal heredero abintestato de Don Santiago Orona Acevedo, a su hijo Mario Orona Cruz. La Sala determinó que Don Santiago Orona Acevedo falleció el día 11 de mayo de 1959, sin otorgar testamento. Según la prueba que tuvo ante sí, Mario Orona Cruz nació el 26 de abril de 1947, fuera de matrimonio, y fue reconocido por sus padres.

En 13 de mayo de 1960 compareció a la Sala de Aguadilla Doña Carmen Acevedo Vda. de Orona y alegó que a tenor del derecho vigente allá para el año 1947, fecha en que nació Mario Orona Cruz,—y acepta que era hijo natural reconocido de su hijo Don Santiago Orona Acevedo,—en el caso de quedar ascendientes legítimos, los descendientes naturales reconocidos sólo tendrían derecho a la mitad del haber hereditario, correspondiendo la otra mitad al ascendiente, en este caso, ella. Solicitó Doña Carmen Acevedo del Tribunal que

enmendara su Resolución declarándola a ella también heredera abintestato de su hijo legítimo Don Santiago Orona Acevedo, en la mitad de los bienes relictos por éste.

Después de ser oídas las partes, el 24 de marzo de 1961 la Sala sentenciadora dictó sentencia basada en conclusiones de hecho y de derecho, declarando sin lugar la petición de Doña Carmen Acevedo, y dejó en todo su vigor la Resolución originalmente dictada. Una moción de reconsideración fue declarada sin lugar y Doña Carmen Acevedo ha comparecido ante nos impugnando dicha sentencia.

Antes de entrar de lleno en la consideración del problema suscitado, vamos a hacer una breve exposición del derecho a la herencia en la década de 1942 a 1952, y a la fecha del fallecimiento en 1959.

— I —

Hasta que fue enmendado por la Ley Núm. 447 aprobada en 14 de mayo de 1947 efectiva 90 días después de su aprobación, el Art. 736 del Código Civil (ed. 1930) disponía que serían herederos forzosos, con respecto a la legítima o porción de bienes de que el testador no podía disponer por haberla reservado la ley a determinados herederos, (1) los hijos y descendientes legítimos respecto de sus padres y ascendientes legítimos; (2) *a falta* de los anteriores, los padres y ascendientes legítimos respecto de sus hijos y descendientes legítimos; (3) el viudo o viuda, y los hijos naturales legalmente reconocidos y el padre o madre de éstos, en la forma y medida que establecían los Arts. . . . , 767, 768, . . . . del Código. La enmienda hecha por la Ley Núm. 447 antes aludida, dispuso que son herederos forzosos, (1) los hijos y descendientes legítimos respecto de sus padres y ascendientes legítimos, *y los hijos naturales legalmente reconocidos respecto de sus padres y ascendientes naturales o legítimos;* (2) *a falta* de los anteriores, los padres y ascendientes legítimos respecto de sus hijos y descendientes legítimos; (3) el viudo o viuda en la forma y medida que establecen los Arts. . . . . . . . del Código.

Con motivo de esa legislación enmendatoria este Tribunal sostuvo en *Travieso v. Del Toro y Travieso, Int.*, 74 D.P.R. 1009, pág. 1013—ratificando la doctrina contenida en *Sánchez v. Corte*, 69 D.P.R. 493—que. existiendo *testamento*, el padre legítimo no era en el caso de Travieso un heredero forzoso, y que sus derechos hereditarios como tal quedaron excluidos por la existencia de una hija natural, bajo el Art. 736 del Código Civil tal como había sido enmendado por la Ley Núm. 447 de 1947.

En cuanto a los derechos de los hijos denominados ilegítimos, disponía el Art. 767 que cuando el testador dejara hijos o descendientes legítimos e hijos naturales legalmente reconocidos, tendría cada uno de éstos derecho a la mitad de la cuota que correspondiera a cada uno de los legítimos no mejorados, siempre que cupiera dentro del tercio de libre disposición. Y disponía el Art. 768 siguiente, que cuando el testador no dejara hijos o descendientes, pero sí *ascendientes* legítimos, los hijos naturales reconocidos tendrían derecho a la mitad de la parte de herencia de libre disposición. Según quedó enmendado por las Leyes Núm. 13 de 29 de marzo de 1945 y Núm. 255 de 10 de mayo de 1949, dicho Art. 767 expresa que cuando el testador deje hijos o descendientes legítimos e hijos naturales legalmente reconocidos, tendrá cada uno de éstos derecho a la misma cuota que corresponda a cada uno de los legítimos no mejorados . . . . El Art. 768 en la parte citada, según fue enmendado por la Ley Núm. 13 de 1945, reservó al hijo natural reconocido, concurriendo con ascendientes legítimos, la mitad del haber.

Hasta aquí, algunas disposiciones referentes a la sucesión *testada*. En cuanto a la sucesión *intestada*, dispone el Art. 893 del Código Civil que la sucesión corresponde *en primer lugar* a la línea recta descendente; y el 884, que en las herencias, el pariente más próximo en grado *excluye* al más remoto, salvo el derecho de representación cuando tiene lugar. Bajo el epígrafe "De los hijos ilegítimos reconocidos" en la sucesión intestada, disponía el Art. 902 antes de ser enmen-

dado por las Leyes Núm. 448 de 14 de mayo de 1947 y Núm. 253 de 9 de mayo de 1950, que en caso de quedar descendientes o ascendientes legítimos, los descendientes naturales reconocidos sólo percibirían de la herencia la porción que se les concedía en los Arts. 767 y 768, a los cuales hemos hecho referencia, antes y después de ser ellos enmendados.

Con posterioridad a dichas leyes enmendatorias, dispone el Art. 902 en lo pertinente que "En caso de quedar ascendientes legítimos, los descendientes naturales reconocidos sólo percibirán de la herencia la porción que se le concede en el Art. 768 de este Código." Sabemos que la porción que determina el Art. 768 es la mitad del haber hereditario.

— II —

Lo expuesto es la ley positiva en lo pertinente a este caso tal como se leía en 20 de agosto de 1952, fecha en que fue aprobada la Ley Núm. 17 disponiendo:

"Para establecer la Igualdad de Derechos de los hijos.

. . . . . . .

Artículo 1.—Todos los hijos tienen respecto a sus padres y a los bienes relictos por éstos, los mismos derechos que corresponden a los hijos legítimos.

Artículo 2.—Las disposiciones de esta Ley tienen efecto retroactivo al día 25 de julio de 1952."

El causante en este caso falleció el 11 de mayo de 1959, con posterioridad a la vigencia de la anterior Ley Núm. 17. Es un principio cardinal en nuestra doctrina civil, que los derechos hereditarios se determinan a la luz de la legislación vigente al tiempo del fallecimiento. *Berdecía* v. *Tribunal Superior*, 87 D.P.R. 108 (1963), y casos ahí citados; *Sucn. Rosario Andino* v. *Rosario Andino*, 85 D.P.R. 135, (1962) ; *Cortés Córdoba* v. *Cortés Rosario.* 86 D.P.R. 117, (1962) ; *Abintestato de Clara Vélez, Ex parte*, 81 D.P.R. 653, pág. 665; *Abintestato de Ana Garroti*, 79 D.P.R. 190; *Cancel* v. *Martínez*, 74 D.P.R. 108; *Travieso* v. *Del Toro, y Travieso, Int.* supra; *Febre* v. *Febre*, 40 D.P.R. 219; *Gijón* v. *Surillo et al.*, 31 D.P.R. 199; *Torres* v. *Rubianes et al.*, 20

D.P.R. 337; *Correa* v. *Correa*, 18 D.P.R. 117. No solamente por razón de las técnicas del derecho, ya que por muchas posibilidades y expectativas que tenga un individuo de heredar su derecho no toma cuerpo ni se plasma sino hasta que ocurre el fallecimiento, también, y lo que es aún más importante, si se toma en cuenta que en el derecho a suceder hay envueltas consideraciones básicas de política pública del Estado, política pública que puede tener que ser alterada a la luz de estados sociales y económicos distintos a través de distintas épocas. Atar el derecho sucesorio a la ley vigente al nacimiento de una persona equivaldría a restringir los poderes del Estado en cuanto a su función de determinar su política pública a lo largo de un prolongado período de tiempo como es el que puede llevar la vida natural.

■ Al advenir a la herencia Mario Orona Cruz en el año 1959, la ley vigente disponía que él tendría, respecto a su padre y a los bienes relictos por éste, los mismos derechos correspondientes a los hijos "legítimos". De haber sido él un hijo "legítimo" según la nomenclatura anterior, esto es, que hubiera nacido dentro de matrimonio, él hubiera heredado la totalidad de la herencia en virtud de lo dispuesto en los Arts. 884 y 893 antes citados, y en el Art. 898:—"A *falta* de *hijos* legítimos o ilegítimos reconocidos y sus descendientes, heredarán al difunto sus *ascendientes* con exclusión de los colaterales." Al tener la condición de hijo natural reconocido, el hijo en este caso hubiera tenido que heredar sujeto al Art. 902, antes citado, o sea en la mitad. Pero, en virtud y por razón de la Ley Núm. 17 de 20 de agosto de 1952, su derecho como hijo es el que tendría un "legítimo".

La recurrente planteó ante el Tribunal de instancia y plantea ante nos, la relación que hay entre la Ley Núm. 17 de 20 de agosto de 1952, su Art. 2 dándole efecto retroactivo al 25 de julio de 1952, fecha en que se proclamó la Constitución del Estado Libre Asociado, y la declaración contenida en la Sec. 1 del Art. II de la Constitución, al efecto de que todos los hombres son iguales ante la ley; que no podrá estable-

cerse discrimen alguno por motivo de.........nacimiento, origen o condición social,............y que tanto las *leyes* como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. Por esta relación que incuestionablemente existe tanto histórica como espiritualmente entre esas disposiciones, sostiene la recurrente que la Ley Núm. 17 no cubre a este hijo por cuanto *él* nació con anterioridad al 25 de julio de 1952. Fundamentalmente el problema viene a situarse en torno al significado y efecto que debe tener el Art. 2 de la referida Ley Núm. 17, que es su cláusula de vigencia a la luz del derecho que el Art. 1 declara. Esto nos ha llevado a una búsqueda de historial legislativo de este estatuto para tratar de descubrir su verdadera intención y propósito.

A la sesión extraordinaria de la Asamblea Legislativa que comenzó el 28 de julio de 1952, el Gobernador envió una Proclama fechada 31 de julio sometiendo asuntos a ser considerados, entre ellos, "Legislación instrumentando la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico eliminando discrímenes por motivo de nacimiento." El asunto se convirtió en el Proyecto del Senado Núm. 18 que según fue informado al Senado favorablemente por su Comisión Jurídico Civil, quedó redactado de la manera en que dispone la Ley Núm. 17 (¹). Aprobado en el Senado, pasó a la Cámara. Al darse cuenta por el Secretario, el Vicepresidente Hon. Benjamín Ortiz, dijo lo siguiente (²) :

"El Problema que había ocurrido en cuanto a esta legislación se refería a lo siguiente: Bajo la Constitución, como ustedes saben, se elimina el discrimen por razón de nacimiento; o sea, que todos los hijos son iguales en derechos hereditarios y posición social y legal. Hijos naturales, adulterinos, legítimos, están en la misma situación, con los mismos derechos de herencia. Había una controversia al efecto de si esta legislación debía aplicarse a los hijos que *nacieran después de la Constitución*, mien-

(¹) *Diario de Sesiones*, Sesión Ext., Vol. 1, 1952, págs. 33, 36.

(²) *Diario de Sesiones*, ídem., pág. 48.

tras otros alegaban que también a los que habían *nacido antes,* o sea, a todos los hijos que *vivan* en la actualidad.

Este proyecto del Senado cubre a todos los hijos. A los que *han nacido antes y los que nazcan después.* De modo que aquéllos que favorecen esa tesis entre los cuales me encuentro yo, que debe ser aplicado a todos los hijos, aunque hayan *nacido antes* de la Constitución, pues es la intención del proyecto incluir aún aquéllos que hayan *nacido antes.*

Sr. SANTALIZ CAPESTANY: ¿Entonces, quedan cubiertos todos los hijos?

Sr. ORTIZ: Quedan cubiertos todos. *Y que se haga constar en Acta que ésa es la intención de la Cámara al aprobar este proyecto: que la legislación se aplique a todos los hijos que hayan nacido antes de la Constitución y después de la Constitución. A todos los hijos que vivan ahora.* Después dice: 'Las disposiciones de esta Ley tienen efecto retroactivo al día 25 de julio de 1952.' Como la Constitución fue efectiva el 25 de julio, la Legislación es efectiva conjuntamente con la Constitución.

Sr. ROMÁN GARCÍA: ¿Pero no podría interpretarse que esto será efectivo al 25 de julio de 1952?

Sr. ORTIZ: No. Lo que quiere decir es que aquellos niños o hijos *que vivían* el 25 de julio tienen los mismos derechos. Los que *vivían* el 25 de julio, y los que nazcan después.

Sr. ROMÁN GARCÍA: No veo claro eso.

Sr. FIGUEROA CARRERAS: Vamos a ver eso con detenimiento, porque eso no está claro.

Sr. ORTIZ: ¿Cuál es la objeción que hay entonces a la fraseología ésta?

Sr. VALENTÍN VIZCARRONDO: Señor Presidente . . .

Sr. SANTALIZ CAPESTANY: Señor Presidente: Para una enmienda.

Sr. VALENTÍN VIZCARRONDO: No sé si es que yo estoy ofuscado pero me parece que el Artículo 1 de ahora no dice igual al artículo 1 del proyecto.

Sr. ORTIZ: No. Es una enmienda del Senado.

Sr. VALENTÍN VIZCARRONDO: Ya lo sé, pero la enmienda me parece que la deberíamos aceptar mejorando el texto anterior, no para quitarle derechos al ciudadano de Puerto Rico. Y me parece que el texto nuevo restringe derechos . . .

Sr. ORTIZ: Restringe más, ¿cree el compañero?

Sr. VALENTÍN VIZCARRONDO: Porque aquí dice 'a partir de la vigencia de esta ley . . .'

Sr. Ortiz: ¿Me permite? Yo pregunto si la intención del compañero es que se diga claramente que se aplica a todos los hijos nacidos antes y después.

Sr. Valentín Vizcarrondo: Sí, seguro.

Sr. Ortiz: Muy bien. Yo sugiero que pase a Comisión Jurídica Civil para que traiga ese texto más claro.

Sr. Valentín Vizcarrondo: Muy bien.

Sr. Santaliz Capestany: No hay necesidad de que pase a Comisión. Señor Presidente: Para una enmienda. Señor Presidente: para que el proyecto no vaya a Comisión, yo sugiero la siguiente enmienda: que diga que es retroactivo a todos los hijos nacidos antes del 25 de julio de 1952. Retroactivo a todos los hijos nacidos.

Sr. Ortiz: Que esa idea . . .

Sr. Santaliz Capestany: Retroactivo. Se entiende que si se hace retroactivo a todos los hijos nacidos antes del 25 de julio de 1952 cubre a todos los que nazcan después de esa fecha.

Sr. Ortiz: Señor Presidente: que esa idea pase a la Comisión también para que le den la fraseología correspondiente.

Sr. Presidente: A Comisión." (Bastardillas nuestras.)

En la sesión del día siguiente 6 de agosto de 1952 se trajo a consideración de nuevo el Proyecto 18 y tuvieron lugar los siguientes procedimientos, en que el Presidente de la Comisión Jurídico Civil Hon. Arcilio Alvarado informó ampliamente[3]:

"Sr. Santaliz Capestany: Dada la importancia de este proyecto y las implicaciones sociales que tiene el mismo, yo desearía que el Presidente de la Comisión le explicara claramente a la Cámara si en el Artículo 2, cuando dice que las disposiciones de esta ley serán retroactivas al 25 de julio, cubre aquélla a todos los hijos, a todos los hijos legítimos y naturales en paridad de derechos con los hijos legítimos, en el caso en que sus padres murieran después de la fecha de 25 de julio.

Sr. Alvarado: La contestación a esa pregunta es que sí, definitivamente. Que sí. Yo quisiera hacer una explicación aunque sea . . .

Sr. Santaliz Capestany: (Interrumpiendo) Otra pregunta, si me permite el compañero. Tengo dos preguntas. La otra

---

[3] *Diario de sesiones,* ídem., págs. 61–66.

pregunta es la siguiente: ¿Entonces, en los casos de hijos naturales o de hijos ilegítimos en que sus padres hayan muerto y se hayan resuelto los casos, los litigios de herencia en las cortes de Puerto Rico de acuerdo con las leyes anteriores a la aprobación y a la adopción de la Constitución por el pueblo de Puerto Rico, no se cubren por esta ley?

Sr. Alvarado: No se cubren por esta ley aquellos casos en que el causante, o sea, el que trasmite la herencia murió, haya muerto antes del día 25 de julio. Es decir, la situación es la siguiente: La Constitución dispone que todos los hijos son iguales ante la ley; y esa Constitución empezó a regir el día 25 de julio. Antes del 25 de julio todos los hijos no eran iguales ante la ley. Estaban clasificados en hijos legítimos, en hijos ilegítimos, en hijos adulterinos y tenían derechos distintos según la clasificación distinta de su condición de hijos. Eso cesó el día 25 de julio. Del día 25 de julio, por disposición de la Constitución, todos los hijos son iguales ante la ley.

Ustedes saben que nosotros empezamos a bregar con este problema no en esta Sesión Extraordinaria sino en la anterior Sesión Extraordinaria cuando estábamos aprobando leyes necesarias para instrumentar los cambios producidos por la Constitución. En aquella ocasión hubo una discrepancia fundamental entre el Senado y la Cámara; discrepancia que no trascendió al público porque fue discutida más bien en privado por Senadores y por Representantes. Pero el Senado llegó a aprobar un proyecto a virtud del cual la igualdad entre los hijos que producía la Constitución *sólo se concedía a los hijos que nacieran después de vigente la Constitución.* Con ese criterio no estuvo conforme la Cámara, no de manera oficial; de manera extraoficial, y por cambios de impresiones entre unos y otros representantes no estuvimos conformes con ese criterio. Creímos entonces que el proyecto debería conceder igualdad a todos los hijos desde que se aprobara la Constitución, *no importa que estén ya nacidos y viviendo* y la edad que tengan, aunque tengan sesenta años, pero desde que se establece la igualdad que es desde el día 25 de julio, desde entonces debe subsistir la igualdad para todos los hijos.

No pudimos llegar a un acuerdo con el Senado en esta forma extraoficial y entonces aquí lo que hicimos fue que cuando el proyecto vino aprobado del Senado lo remitimos a Comisión y

no fue considerado." (⁴)

•     •     •     •     •     •     •     •     •     •

"Ustedes saben que los derechos de herencia se trasmiten por la muerte del causante, por la muerte de la persona que tiene los bienes y que tiene los hijos—el causante.

Según el proyecto que estamos aprobando, toda persona que muera el día 25 de julio o después, sus hijos serán considerados iguales en la distribución de los bienes, con iguales derechos, igual a un hijo legítimo, no importa que hubieran tenido la condición de ilegítimos antes de esa fecha.   Y se produce la igualdad entre los hijos desde el día 25 de julio.

Ahora, el proyecto no entra a considerar los casos *de muertes de causantes anteriores al día 25 de julio,* y la situación será que cuando haya muerto el causante antes del 25 de julio el asunto se regirá por la Ley que regía a la fecha de la muerte del causante.

Entendemos que esto debe ser así, que es justo y razonable que sea así.   En primer lugar, hay retroactividad de hoy al 25 de julio que es cuando se produce el cambio constitucional; pero no nos metemos con aquellas herencias ya trasmitidas antes del 25 de julio.   A la muerte del causante antes del día 25 de julio si había diferencias entre los hijos nosotros tenemos que respetar esa diferencia; primero, porque no hacerlo es tratar de darle efecto retroactivo a esta Constitución, meternos tal vez en herencias ya adjudicadas, levantar no se sabe cuántos pleitos, mover qué se yo cuántas cuestiones ya adjudicadas y resueltas, lo cual es peligroso.

SR. VALENTÍN VIZCARRONDO: ¿Me permite una pregunta el compañero?

SR. ALVARADO: Sí.

SR. VALENTÍN VIZCARRONDO: ¿Tiene el compañero a la mano la Constitución, para que nos lea lo que dice?

SR. ALVARADO: No la tengo a la mano, pero recuerdo lo que

---

(⁴) El Presidente de la Comisión Sr. Alvarado se refería aquí,—e igual referencia hace más adelante el Sr. Polanco Abreu,—al Proyecto del Senado Núm. 12 presentado en una Sesión Extraordinaria anterior comenzada el 14 de julio de 1952, el cual disponía así en su Art. 2: "En lo que se refiere a derechos hereditarios las disposiciones del Artículo anterior no serán aplicables a los *nacimientos ocurridos con anterioridad* a la vigencia de la Constitución del Estado Libre Asociado de Puerto Rico."

La Cámara nunca estuvo conforme con que la protección igualitaria de los hijos se concediera sólo a los nacidos después de la Constitución, y terminó la Sesión sin que el Proyecto 12 pasara la Legislatura.

dice. Lo que dice es que no habrá discrímenes por razón de nacimiento.

SR. VALENTÍN VIZCARRONDO: ¿Pero no establece período?

SR. ALVARADO: No. Que no habrá discrímenes por razón de nacimiento. Que no habrá discrímenes por razón de nacimiento.

SR. VALENTÍN VIZCARRONDO: ¿Pero no establece ningún período?

SR. ALVARADO: Sí. Y no habría discrímenes por razón de nacimiento bajo la Constitución. Bajo la Constitución. Ahora, antes de la Constitución había discrímenes por razón de nacimiento.

SR. VALENTÍN VIZCARRONDO: ¿La Constitución acabó con eso?

SR. ALVARADO: Acabó con eso, desde que rige; pero una adjudicación de una herencia hecha diez años, veinte años antes, un día antes de regir la Constitución, no se hizo bajo la Constitución. Se hizo bajo una ley que disponía que había diferencias —desagradables, malas, contrarias a nuestra manera de pensar, pero que existían y que tienen que ser respetadas por nosotros. Ahora, cualquier trasmisión de herencia . . .

SR. VALENTÍN VIZCARRONDO: ¿Por qué respetada, si la Judicatura . . . ?

SR. ALVARADO: No, compañero, esto es una cosa diferente. Son derechos adjudicados al amparo de una ley anterior. En muchos casos los bienes entregados, en muchos casos dispuestos los bienes por los herederos. Si vamos a ir hacia atrás, ¿cuántos años vamos a ir hacia atrás? ¿Cinco, diez, veinte, cincuenta, cien?

SR. VALENTÍN VIZCARRONDO: No importa. Sencillamente la Constitución dice que todos los hijos son iguales.

SR. ALVARADO: No, pero es que eso implicaría que moveríamos a los tribunales centenares de pleitos ya adjudicados a virtud de leyes existentes, en vigor, que daban ese derecho. Y me parece que nosotros no debemos promover un caos en esta materia innecesariamente cuando podemos fácilmente establecer la línea divisoria desde que se hace el reconocimiento de esa igualdad y no meternos cuando no estaba hecho el reconocimiento de la igualdad absoluta.

SR. VALENTÍN VIZCARRONDO: ¿Entonces, el compañero cree que es un caos el que un hijo esté detrás de lo que le pertenece?

SR. ALVARADO: No, No creo que sea un caos. Creo que sea un caos a un hijo a quien ya se le adjudicó y entregó bajo una

ley que le daba eso, unos bienes de los cuales dispuso, que vayamos ahora a ir para atrás a quitarle esos bienes después que ya él ha dispuesto de eso y a producir una situación verdaderamente indeseable y caótica.

SR. VALENTÍN VIZCARRONDO: O darle más.

SR. ALVARADO: No. Pero la mayor parte de las veces será quitarle a personas a quienes ya se les ha dado y eso realmente no es sensato ni es lo que debemos hacer.

SR. SANTALIZ CAPESTANY: Una pregunta al compañero Alvarado: ¿Y cómo serán garantizados los derechos de los hijos naturales o de los hijos ilegítimos por las otras leyes antes de ponerse en vigor la Constitución?

SR. ALVARADO: Siempre prospectivamente. Siempre se respetarán. Es más, hay decisiones del Tribunal Supremo diciendo que tienen que respetarse los derechos adquiridos al amparo de legislación anterior. Siempre se actuó prospectivamente, tanto la ley como las interpretaciones judiciales.

SR. SANTALIZ CAPESTANY: ¿Y no cree el compañero que el proyecto que está ante nuestra consideración no podría ser declarado anticonstitucional?

SR. PRESIDENTE: Use el micrófono para beneficio de los demás compañeros.

SR. SANTALIZ CAPESTANY: ¿Y no cree el compañero que el proyecto que estamos adoptando ahora mismo en cualquier momento no podría resistir un proceso en una corte para declararlo anticonstitucional? A mi me parece que no se ajusta a la Constitución. La Constitución dice: 'Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen.'

SR. ALVARADO: Pero eso desde el día en que esa Constitución empezó a regir. Eso es bueno desde el día 25 de julio.

SR. SANTALIZ CAPESTANY: No. No. Esa no es la interpretación que nosotros le damos. La Constitución establece que no podrá haber discrimen por motivo de nacimiento.

SR. ALVARADO: Antes del día 25 de julio . . .

SR. SANTALIZ CAPESTANY: Y si la ley que nosotros aprobamos ahora no cubre *a los que nacieron* antes del 25 de julio hay discrimen . . .

SR. ALVARADO: *Los cubre.*

SR. SANTALIZ CAPESTANY: Hay discrimen por motivo de nacimiento.

SR. ALVARADO: *Los cubre,* compañero.

SR. SANTALIZ CAPESTANY: Hay discrimen por el hecho de que no nacieron bajo la Constitución.

SR. ALVARADO: Compañero, *los cubre.*

SR. SANTALIZ CAPESTANY: La Constitución hace a todos los ciudadanos iguales.

SR. ALVARADO: ¿Me permite el compañero que le explique? Los cubre. *Esta ley no es para los que nazcan después de la Constitución. Nadie ha dicho eso aquí.* Eso no está en la ley. Un hijo nacido *antes* del 25 de julio que tenga 70 años, que haya nacido en el siglo pasado, pero que su padre esté vivo todavía, *si el padre muere después del 25,* es decir, *si el derecho de herencia tiene efectividad después del 25 de julio, pues esa persona tiene igual derecho que un hijo legítimo. De manera que no es el nacimiento lo que lo determina.*

SR. SANTALIZ CAPESTANY: ¿Y si murió el padre?

SR. ALVARADO: Lo que ustedes pretenden requeriría que viráramos para atrás del día 25 de julio a adjudicaciones ya hechas por tribunales a casos ya adjudicados de quiénes son los herederos bajo leyes existentes, vigentes y entonces buenas, para deshacer todo lo hecho, no se sabe hasta cuánto tiempo para atrás, lo cual, a mi juicio, es insensato.

SR. SANTALIZ CAPESTANY: Entonces, compañero Alvarado, ¿la Constitución no conjura el discrimen cometido contra aquellas personas cuyos padres murieron antes del 25 de julio, de la adopción de la Constitución?

SR. ALVARADO: No, tampoco. Tampoco resuelve el caso de los esclavos que lo eran antes de la abolición de la esclavitud.

SR. SANTALIZ CAPESTANY: Pero ya no lo son. Habían sido liberados antes de la Constitución." (Bastardillas nuestras.)

Siguió el debate con el Sr. Valentín Vizcarrondo. Su posición, como la del Sr. Santaliz, iba más lejos:—que la ley de igualdad debía extenderse aun a los derechos de herencia en fallecimientos ocurridos *antes* de la Constitución, según ellos interpretaban la declaración Constitucional.—El Presidente de la Comisión Sr. Alvarado continuó explicando:

"SR. ALVARADO: Se corrige desde el día 25 de julio en adelante. Ahora, meternos nosotros antes del 25 de julio es sencillamente tratar de darle efecto retroactivo a la Constitución, perjudicar derechos adquiridos a virtud de legislación anterior,

y levantar un caos en materia de herencia en Puerto Rico; centenares y miles de pleitos, no se sabe hasta cuándo hacia atrás y sabe Dios qué efecto tendría en la economía del país."

.    .    .    .    .    .    .    .    .    .

"Sr. Díaz Marchand: Entonces, ¿yo debo entender, compañero Arcilio Alvarado, *que no importa la fecha en que haya nacido una persona siempre que sus padres estén vivos . . . ?* ¿No es así?

Sr. Alvarado: *Sí.*

Sr. Díaz Marchand: ¿Tiene derecho?

Sr. Alvarado: *Igual.*

Sr. Díaz Marchand: *¿Igual al hijo legítimo?*

Sr. Alvarado: *Sí. Eso es correcto.*

Sr. Díaz Marchand: Ahora bien. Una persona, por ejemplo, nacida en cualquier fecha antes del 25 de julio, no empece el hecho de que tiene igual derecho al hijo legítimo, si su padre hubiera muerto a virtud de lo cual adquiere el derecho de herencia, no puede ya alegar ese derecho.

Sr. Alvarado: Si el padre murió antes del 25 de julio; si murió el padre antes del 25 de julio. La herencia se trasmite con la muerte.

Sr. Díaz Marchand: En otras palabras, ¿lo que establece la diferencia es que el padre no haya muerto todavía para que tenga ese derecho?

Sr. Alvarado: El 25 de julio. Que no haya muerto el 25 de julio.

Sr. Díaz Marchand: Exacto.

Sr. Alvarado: Es decir la herencia se trasmite por la muerte. Este sistema de igualdad en cuanto a los bienes hereditarios se establece con la Constitución y es efectivo desde el día 25 de julio *para todos los casos en que el causante muere el 25 de julio o después.* Cuando el causante muere *antes* del 25 de julio entonces la herencia se rige por la legislación vigente en la fecha de la muerte.

Sr. Díaz Marchand: En otras palabras, ¿qué *no hay diferencias establecidas* por virtud de la época o de la fecha en que *haya nacido el heredero* en este caso?

Sr. Alvarado: *Correcto, correcto. Así mismo es.*

Sr. Díaz Marchand: Sino que la diferencia estriba en cuanto a que los padres de quien habría de heredar—el hijo en este caso—estén todavía vivos en este momento.

SR. ALVARADO: *Eso es.* Que el derecho de herencia se adquiera por la Constitución. Que el derecho de herencia se adquiere por la muerte del causante. Que haya muerto el causante el día 25 de julio o después, no importa *cuándo haya nacido el hijo."* (Bastardillas nuestras.)

En esta etapa intervino el Sr. Santiago Polanco Abreu, sosteniendo la posición del Sr. Alvarado:

"SR. POLANCO ABREU: Creo mi deber unir mi voz a la del compañero Alvarado en este momento en que estamos discutiendo una legislación que yo, desde que ocupé asiento en esta Cámara, he venido defendiendo, presentando proyectos año tras años y que por una u otra razón no habían podido ser aprobados.

. . . . . . . . .

De suerte que esta legislación que está ante la consideración de nosotros es el ansia de creo que de la generalidad de nosotros, de todos los que estamos sentados en esta Cámara de Representantes; pero dentro del concepto realista de los principios de derecho expuesto brillantemente por el compañero Alvarado, no tenemos otra alternativa que contestar a los que nos preguntan si esto se refiere a particiones, testamentarías, efectuadas con anterioridad al 25 de julio de que esta legislación nunca podría ser aplicada a eso . . .

SR. SANTALIZ CAPESTANY: (Interrumpiendo) ¿Por qué?

SR. POLANCO ABREU: Porque ya se había adquirido un derecho, porque ya esos hijos habían adquirido unos derechos, esos mismos hijos naturales habían adquirido unos derechos al amparo de una legislación específica. Pero nótese que nosotros nos enfrentamos a un criterio expuesto por el Senado en un proyecto de ley, y, sin embargo, ¿cuál era la posición básica nuestra? De que el proyecto como vino fraseado originalmente *solamente tenía el alcance de proteger a los hijos que nacieran después del 25 de julio,* cuando el criterio que sustentamos aquí y que hemos venido sustentando desde hace muchos años es que debe aplicarse *a todos los hijos nacidos con anterioridad a la Ley* siempre y cuando que los padres *mueran después* del 25 de julio.

. . . . . . . . .

SR. ORTIZ: Señor Presidente: Unas breves palabras para aclarar o expresar mi criterio sobre el punto de vista legal o jurídico que se ha planteado aquí en este asunto.

En primer lugar quiero recordar que la controversia anterior que se había manifestado en esta Asamblea Legislativa, en la Sesión Extraordinaria pasada no se refería a esto que estamos discutiendo ahora sino a que había algunos que creían que esta legislación debía aplicarse solamente a los hijos que nacieran después de la Constitución, y otros que querían que se aplicara a todos los hijos nacidos antes o después. Yo soy uno que favorezco la segunda tesis, o sea, que se aplique a todos los *hijos* nacidos antes o después de la Constitución, para establecer esa igualdad.

El Proyecto del Senado se aplica tanto a los hijos que *nazcan después* de la Constitución como a los que *hayan nacido antes* pero que no se hayan materializado todavía derechos adquiridos. Y aquí viene la dificultad de los compañeros.

El sentido de justicia del compañero Valentín y el compañero Santaliz y de otros compañeros, pues, les indica que si es aplicable esta legislación a los que hayan nacido antes, pues ¿por qué establecer una diferencia en cuanto a que los padres mueran después de la Constitución y por qué no aplicar el mismo principio a aquellos casos en que los padres han fallecido antes? O sea, para establecer la igualdad absoluta, la justicia absoluta. Pero, a pesar de que comprendo la justicia de la posición tenemos que enfrentarnos con unas dificultades constitucionales, porque, por ejemplo, si los padres han fallecido antes eso implica que los hijos que tenía ese padre han adquirido ciertos derechos hereditarios bajo la legislación vigente, que hubo particiones, que hubo distribuciones, escrituras, contratos, que hubo sentencias, pleitos ya resueltos con todos los derechos correspondientes, y yo aseguro que es un principio de ley constitucional que una legislación posterior no puede afectar derechos adquiridos anteriormente. Y esa es una regla básica y elemental.

. . . . . . . .

SR. ROMÁN GARCÍA: Señor Presidente y compañeros de Cámara: Casualmente cuando vino este proyecto ayer ante la consideración de la Cámara, por tener serias dudas que albergaba en mi mente la aprobación de una legislación de esta índole, fue que se levantó, como pudiéramos decir, alguna mareíta. Y este proyecto pasó a Comisión para ser estudiado. Esta mañana el compañero Arcilio Alvarado antes de entrar en la sala empezó a explicarme los alcances de esta legislación. De primera intención tengo que confesar que mis puntos de vista eran iguales que

los que sostiene el compañero Valentín y que el que sostuvo el compañero Santaliz.

Ahora, no debemos cerrarnos a la realidad. La realidad positiva es que si ya *han habido particiones, liquidaciones de herencia, sentencias en los tribunales y todos estos procesos,* que son hechos consumados ya, me parece que una disposición como la que estaba primeramente, y es la que han venido sosteniendo los compañeros Valentín y Santaliz, me parece que una legislación que conllevara, como ha explicado el compañero Ortiz, el anular esas liquidaciones, esas particiones de herencia que se hubieran hecho antes, sería inconstitucional.

SR. VALENTÍN VIZCARRONDO: ¿Aunque fueran injustas, compañero?

SR. ROMÁN GARCÍA: No estamos sobre la cuestión de que fueran injustas. Yo considero que no son injustas por cuanto estuvieron expeditadas y regimentadas por estatutos y leyes que existieron a la fecha en que se hicieron esas liquidaciones o se declararon esas herencias.

Así pues, yo quiero confesar que el criterio que se ha discutido aquí, se ha esclarecido en la discusión de este proyecto, ha variado por completo el criterio que yo sustentaba hace apenas una media hora tal vez." (Bastardillas nuestras.)

En la sesión del 8 de agosto se aprobó el Proyecto 18 con todos los votos en la afirmativa, inclusive los de los Señores Santaliz Capestany y Valentín Vizcarrondo, y así surgió la Ley Núm. 17.

Quizás no sean muchas las ocasiones en que como en ésta, afortunadamente se pueda contar como resultado de un amplio debate sobre la aplicación y efectos de una legislación, con una expresión legislativa más indubitada como la referente a la Ley Núm. 17 que establece la igualdad de derechos de los hijos en los bienes de sus padres. Ésta es una de esas ocasiones en que por tratarse, no de una legislación de tipo técnico o meramente legalista, sino de una legislación social reivindicatoria, la expresión legislativa en cuanto a propósitos y efectos debe tener para los tribunales un incalculable valor. Pero aparte de su contenido social, la legislación según la tuvo en mente el Legislador responde con gran fide-

lidad al principio de derecho aceptado de que debe ser la ley vigente al tiempo del fallecimiento, y no la ley vigente al nacimiento, la que ha de regir el derecho a la herencia.

No debe haber la menor duda de que la Ley Núm. 17 no rige derechos hereditarios de ningún hijo en el caso de un fallecimiento ocurrido con anterioridad a su vigencia, 25 de julio de 1952, por los principios de derecho aplicables y por las razones de política pública que tan claramente expresaron los señores Legisladores. Pero tampoco debe haber la menor duda de que la Ley Núm. 17 rige los derechos de herencia de un hijo en cualquier caso en que el fallecimiento ocurre con *posterioridad* a su vigencia, no importa que el hijo hubiera nacido *antes* de esa fecha. Si bien es cierto que la Asamblea Legislativa al adoptar la Ley Núm. 17 actuaba a tenor de la disposición Constitucional al efecto de que ". . . . las leyes . . . . encarnarán estos principios de esencial igualdad humana", no fue con la Constitución que surgió esta jornada, que se remonta a la legislación sobre hijos de 1942. De ahí que en el Informe de la Comisión de la Carta de Derechos, su Presidente el Delegado Sr. Jaime Benítez expresara, refiriéndose al nacimiento, que la *legislación actual ya cubría en su casi totalidad*, lo dispuesto en el informe. La Asamblea Legislativa, esto es, no necesitaba, ni dependía necesariamente de la autoridad de la disposición constitucional, para aprobar legislación como la Ley Núm. 17.

Podríamos terminar ya la disposición de este recurso, a no ser porque la recurrente invoca las decisiones de este Tribunal en los casos de *Álvarez* v. *Álvarez,* 77 D.P.R. 909; *Sánchez* v. *Díaz,* 78 D.P.R. 811; *Márquez* v. *Avilés,* 79 D.P.R. 988 y *Abintestato de Clara Vélez, Ex Parte,* 81 D.P.R. 653.

*Álvarez* v. *Álvarez* no está en lo más mínimo en pugna con el principio que hemos expuesto. Basta decir, si bien no aparece de la faz de la opinión, pero por el expediente, que el causante en el caso de *Álvarez* falleció con *anterioridad* al 25 de julio de 1952, el 6 de enero de 1951, y no con posterioridad. Había que aplicársele, como se le aplicó, las leyes

vigentes al tiempo de su fallecimiento y de acuerdo con dichas leyes sostuvimos que unos hijos que a tenor de la legislación anterior al 1942 tenían estado de hijos adulterinos, podían ser reconocidos obligatoriamente al solo efecto de llevar el apellido de su padre, sin derecho a la herencia.

En *Sánchez* v. *Díaz* ocurre que una demanda de filiación se interpuso viviendo el padre, y el problema que se suscitó no fue uno de herencia y sí uno sobre suficiencia de prueba para dejar establecida la filiación, que denegamos. Este caso tampoco está en conflicto con lo que hoy se dice.

Igualmente, la decisión de *Abintestato de Clara Vélez, Ex Parte*, no ofrece obstáculo, ni es contraria. Ahí el fallecimiento ocurrió el 20 de enero de 1952, o sea, *antes* de proclamarse la Constitución y de regir la Ley Núm. 17. Se adjudicó un derecho de propiedad de origen hereditario a la luz de la legislación vigente a la fecha del fallecimiento.

En *Márquez* v. *Avilés*, invocado también por la recurrente, el fallecimiento ciertamente ocurrió con posterioridad a la Ley Núm. 17, en 18 de marzo de 1954 según consta en el récord de apelación y concluyó la Sala sentenciadora. Pero *Márquez* v. *Avilés* surgió como un problema de filiación, de hijos nacidos con anterioridad a la legislación filial de 1942. No es necesario que nos pronunciemos ahora en cuanto a esa decisión emitida a la luz de sus propios hechos. Basta decir que ante la situación de hecho distinta del caso de autos, en donde no hay una cuestión de filiación y el hijo nació con posterioridad al año 1942, *Márquez* v. *Avilés* no impide tampoco lo que hoy resolvemos.